IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DONALD HYNES,

          Plaintiff,

vs.                                                  No. CIV 05-1333 LFG/RLP

DOÑA ANA COUNTY BOARD OF
COMMISSIONERS, et al.,

          Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART DEFENDANTS' MOTION FOR
## PARTIAL SUMMARY JUDGMENT AND DISMISSING CASE

THIS MATTER comes before the Court on Defendants' Motion for Partial Summary Judgment as to Individual Defendants and to Counts I and III [Doc. 22], filed August 4, 2006, along with a Memorandum in Support [Doc. 23]. Plaintiff filed his Response [Doc. 24] and Defendants their Reply [Doc. 27]. The motion is fully briefed and ready for ruling. No oral argument is necessary. For the reasons given below, the Court grants the motion as to the federal cause of action alleged in Count I. The Court further declines jurisdiction over the remaining state law counts which are remanded to state court, and dismisses the action.

### Factual and Procedural History

On Friday, December 19, 2003, Plaintiff Donald Hynes ("Hynes") was being held at the Doña Ana County Detention Center (DACDC) awaiting a hearing on a federal criminal complaint. He was involved in an altercation with other inmates at DACDC on that date and received a serious head

injury.  Following the altercation, Hynes was taken to the Medical Services Unit at DACDC and from there was transported to the emergency room of the Memorial Medical Center in Las Cruces, New Mexico.  He was examined by a doctor and released from the hospital that day but was told to come back on Monday, December 22, 2003, to be seen by a surgeon for probable surgery.  Hynes was returned to the hospital on December 22 and underwent skull surgery that week.  Since the time of the surgery, he has experienced continuing symptoms including headaches and vision problems.

Hynes alleges that individual officers, jail officials and county commissioners were deliberately indifferent to his safety, in that they failed to protect him from assault by other inmates and thereafter failed to provide him with adequate medical care.  On May 18, 2004, he filed an action in federal court naming as defendants Doña Ana County and Major Chris Barela in his official capacity as Acting Administrator of DACDC, Civ. No. 04-555 LAM/KBM.  That suit was dismissed on May 18, 2005 for failure to exhaust administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).

Thereafter, on September 28, 2004, Hynes filed a similar action in New Mexico state court, County of Doña Ana, No. CV 2004-1237.  He was given leave to amend the complaint and filed his First Amended Complaint on December 13, 2005, adding nine additional defendant correctional officers in their individual and official capacities, plus John and Jane Does.

In the First Amended Complaint ("FAC"), Hynes alleges three causes of action:  (1) Count One, a claim under 42 U.S.C. § 1983 alleging deprivation of his constitutional rights to be free from assault by fellow inmates and to be provided adequate medical care; (2) Count Two, a claim under the New Mexico Tort Claims Act ("NMTCA"), asserting waiver of sovereign immunity under NMSA (1978) § 41-4-12 for negligence causing assault and battery; and (3) Count Three, another claim

2

under the NMTCA, asserting waiver of sovereign immunity under NMSA (1978) § 41-4-6 for negligent operation or maintenance of a public building.  [FAC, attachment to Doc. 1, Notice of Removal].[1]

On December 22, 2004, Defendants removed this case to federal court [Doc. 1] on the jurisdictional ground that a federal question was involved, based on Plaintiff's allegations in Count One of federal constitutional deprivations.  There is no ground for diversity jurisdiction, as Hynes asserts in his complaint that "[a]ll of the parties in this case reside in New Mexico and do business in the State of New Mexico and the acts complained of all occurred within the State of New Mexico." [FAC, ¶ 1].  Defendants do not dispute this assertion.  [Answer, Doc. 2, at ¶1].

Defendants' Motion for Partial Summary Judgment seeks dismissal of Counts One and Three of the First Amended Complaint.  As to Count One, Defendants assert qualified immunity for the individual defendants and argue as to those defendants, as well as to the supervisory and municipal defendants, that Hynes has failed to establish the requisite deliberate indifference to a substantial risk of harm at the hands of other inmates, nor deliberate indifference to his serious medical needs.  As to Count Three, Defendants argue that Plaintiff has failed to show a waiver of sovereign immunity for liability based on negligent operation or maintenance of a public building.

The Court agrees that Plaintiff has not made the requisite showing with respect to Count One, and that claim is subject to dismissal on summary judgment.  Having resolved all federal claims in this action in favor of Defendants, the Court declines jurisdiction over the remaining state law claims, pursuant to 28 U.S.C. § 1367(c)(3).  The Court will therefore dismiss this case and remand the

---

[1]In this renewed complaint, Hynes alleges that he exhausted all of the administrative remedies available to him.  Defendants do not contest this statement, and the Court does not find it necessary to examine the issue further, given the resolution of the current motion.

remaining state law claims to New Mexico District Court, where the lawsuit was originally filed.

## Discussion

### Standards for Summary Judgment and Qualified Immunity

Defendants seek summary judgment.  A summary judgment proceeding is appropriately used to cut through the allegations of the pleadings and to determine if there is a triable issue.  Summary judgment will be granted when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995).  The court does not decide the issues of fact, but rather determines if there is an issue that must be resolved at trial.

The party moving for summary judgment must shoulder the burden of showing the absence of a triable issue.  This must be done by the submission of legally admissible evidence including affidavits, answers to interrogatories, deposition testimony or admissible documentary evidence.

The party opposing summary judgment may not remain silent in the face of a meritorious showing, but must submit admissible evidence by way of affidavits, answers to interrogatories, admissions, or deposition testimony to show that a material fact is in dispute.  The party may not simply rely on his/her complaint, nor will mere argument or contentions of counsel suffice.  Fed. R. Civ. P. 56(e); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671-72 (10th Cir. 1998).  The failure to submit evidence to counter a prima facie showing of entitlement to judgment is fatal.

Summary judgment can be entered only if there is insufficient evidence for a reasonable jury to return a verdict for the party opposing the motion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).  Thus, the Court's inquiry is "whether the evidence presents a

4

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id., 477 U.S. at 251-52.  The Court, in considering a motion for summary judgment, construes the factual record and the reasonable inferences therefrom in the light most favorable to the party opposing the motion.  Foster v. Alliedsignal, Inc., 293 F.3d 1187, 1192 (10th Cir. 2002).

Defendants assert qualified immunity with respect to the individual defendants.  Under the doctrine of qualified immunity, governmental officials performing discretionary functions generally are shielded from liability for civil damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982); Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 516 (10th Cir.1998).  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  Roska v. Peterson, 328 F.3d 1230, 1239 (10th Cir. 2003), *quoting* Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806 (1985).  Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.  Mitchell v. Forsyth, *supra*, 472 U.S. at 526.

When a defendant raises the defense of qualified immunity on summary judgment, the burden shifts to the plaintiff to show:  "that (1) the official violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established when the alleged violation occurred." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002).  If the plaintiff does not satisfy either portion of the two-pronged test, the Court must grant the defendant qualified immunity.  If the plaintiff indeed demonstrates that the official violated a clearly established constitutional or statutory

5

right, then the burden shifts back to the defendant, who must prove that no genuine issues of material

fact exist and that the defendant is entitled to judgment as a matter of law.

> In the end, therefore, the defendant still bears the normal summary
> judgment burden of showing that no material facts remain in dispute
> that would defeat the qualified immunity defense . . . .  When the
> record shows an unresolved dispute of historical fact relevant to this
> immunity analysis, a motion for summary judgment based on qualified
> immunity should be 'properly denied.'

Id., at 1312.

The Court finds that by submission of admissible evidence, Defendants have met their burden

of establishing no genuine issues of fact as to Count One, and summary judgment will be granted on

Hynes's federal claim.

Before proceeding to a discussion of Hynes's particular claims, the Court notes that Hynes

failed to follow this District's Local Rules regarding summary judgment procedures.  D.N.M.LR-Civ.

56.1(b) requires the moving party to "initially set out a concise statement of all of the material facts

as to which movant contends no genuine issue exists.  The facts must be numbered and must refer

with particularity to those portions of the record upon which movant relies."   The party opposing

summary judgment must provide in its Response:

> a concise statement of the material facts as to which the party
> contends a genuine issue does exist.  Each fact in dispute must be
> numbered, must refer with particularity to those portions of the record
> upon which the opposing party relies, and must state the number of
> the movant's fact that is disputed.  All material facts set forth in the
> statement of the movant will be deemed admitted unless specifically
> controverted.

Id..  While Defendants complied with the requirements of D.N.M.LR-Civ. 56.1(b), Hynes did not.

He failed specifically to dispute any of Defendant's "Undisputed Facts" [see, Doc. 23 at 2-3] in the

manner, and with the record support, demanded in Rule 56.1(b). This is not a mere technical violation. Rather, the court relies on Rule 56.1(b) to determine if there are facts in dispute. The Court therefore accepts as undisputed all of the factual matters listed in Defendants' brief, as will be discussed more particularly below.

<u>Plaintiff's Claims of Constitutional Violation</u>

Hynes's complaint is lengthy and repetitive, but the Court discerns two basic claims of constitutional violation: (1) Defendants were deliberately indifferent to his safety in that they failed to protect him from an attack by other inmates; and (2) Defendants were deliberately indifferent to his health in that they failed to provide adequate medical care following the attack.

A.   <u>Standards for Determining Constitutional Protections for Pretrial Detainees</u>

At the time of incidents in question, Hynes was in the pretrial custody of DACDC awaiting a hearing on a federal criminal complaint. [FAC, ¶ 4]. Pretrial detainees are not, technically, protected by the Eighth Amendment's prohibition against cruel and unusual punishment, as a detainee may not be "punished" at all prior to an adjudication of guilt. <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 n.16, 99 S. Ct. 1861, 1872 n.16 (1979). Detainees are instead protected under the Due Process Clause; however, in determining whether a detainee's rights were violated, the Court applies an analysis identical to that applied in Eighth Amendment cases brought under Section 1983. <u>Id.</u>; <u>Lopez v. LeMaster</u>, 172 F.3d 756, 759 n.2 (10th Cir. 1999).

B.   <u>Failure to Protect Hynes From Attack by Other Inmates</u>

While prison officials cannot absolutely guarantee the safety of prisoners, they are responsible for taking reasonable measure to insure the safety of inmates in their custody. <u>Lopez</u>, *supra*, at 759. A prisoner has the right to be reasonably protected from constant threats of violence from other

7

inmates, and a prison official's deliberate indifference to a substantial risk of serious harm to a

prisoner violates the prisoner's constitutional rights.  Riddle v. Mondragon, 83 F.3d 1197, 1204 (10th

Cir. 1996).

To recover on a claim for failure to protect, an inmate must prove two elements:  (1) that he

is incarcerated under conditions posing a substantial risk of serious harm; and (2) that the defendant

prison officials were aware of and disregarded the excessive risk.  Farmer v. Brennan, 511 U.S. 825,

834, 114 S. Ct. 1970, 1977 (1994).   The first element is an objective one:

> A prisoner must demonstrate that the deprivation was sufficiently
> serious and that a prison official's act or omission resulted in the
> denial of the minimal civilized measure of life's necessities . . . .  This
> is an objective standard.  Such conditions have been found to exist
> where prison officials disregard repeated warnings of danger to a
> particular prisoner and continually refuse to make the situation safer,
> for example by . . . separating the prisoner from other inmates who
> previously have attacked him on multiple occasions . . . .  [Internal
> punctuation omitted].

Grimsley v. MacKay, 93 F.3d 676, 681 (10th Cir. 1996).

The second element is subjective and requires a sufficiently culpable state of mind on the part

of the defendant:

> [O]nly the unnecessary and wanton infliction of pain implicates the
> Eighth Amendment . . . .  [A] prison official cannot be found liable
> under the Eighth Amendment for denying an inmate humane
> conditions of confinement unless the official knows of and disregards
> an excessive risk to inmate health or safety; the official must both be
> aware of facts from which the inference could be drawn that a
> substantial risk of serious harm exists, and he must also draw the
> inference.  [Internal punctuation omitted].

Farmer v. Brennan, *supra*, 511 U.S. at 834, 837.

This authority makes clear that an inmate alleging failure to protect as a violation of his

8

constitutional rights must establish that prison officials were actually aware of facts indicating a substantial risk of serious harm. The Court finds that Hynes has failed to rebut Defendants' showing that no genuine issue of fact exists on this element of the claim.

Hynes cannot create a genuine issue of fact solely on the basis of allegations in his complaint or arguments of counsel. Adler v. Wal-Mart Stores, Inc., *supra*, at 671-72. In his complaint he alleges that, on December 19, 2003, the date of the incident, he had been harassed and intimidated throughout the day by other residents in Housing Unit D-1, who called him "nigger" and other derogatory names, and that corrections officers made no attempt to "stop the racial harassment and physical intimidation," in spite of Hynes's "persistent requests to be left alone." [FAC, at ¶ 19].

Hynes's complaint alleges further that, prior to December 19, he "had advised Defendants that he was in danger if he remained housed in Housing Unit D-1 because of racial tensions on the Housing Unit" [FAC, at ¶ 20], and that he "repeatedly warned Defendants that some Hispanic American and/or Mexican national residents regularly threatened the African American residents housed on the unit." [FAC, at ¶ 21]. He alleges on information and belief that prior incidents of racially motivated violence occurred on that particular housing unit. [FAC, ¶ 22]. None of these allegations can be considered as evidence, as they are not properly before the Court by way of a sworn affidavit or other admissible evidence.

Further, in Response to the Motion for Summary Judgment, Hynes's counsel contends:

> Mr. Hynes was one of only two black men assigned to Housing Unit-D. On December 19, 2003, Mr. Hynes was brutally attacked and severely injured by fellow inmates. Prior to the attack on December 19, 2003, Mr. Hynes [sic] attackers persistently and distressingly hurled racial slurs at Mr. Hynes and relentlessly harassed him. Before the attack occurred, Mr. Hynes continuously warned the defendants that he was going to be attacked and asked them several times to

9

> move him to a different unit.  However, the defendants dismissed his
> requests and warnings and took no action to protect him.  *See*
> Affidavit of Samuel Gamble, attached as Exhibit A; Affidavit of
> Anthony Barela, attached as Exhibit B.

[Doc. 24, at 1-2].  Counsel's own arguments or contentions do not suffice.  Adler v. Wal-Mart,

*supra*.  Hynes did, however, submit affidavits of other inmates.  In his affidavit, Samuel Gamble

("Gamble"), a fellow inmate of Hynes's at the time, states that "prior to Mr. Hynes getting attacked,

he had requested from Doña Ana County staff protection from the individuals in question" – that is,

the inmates who attacked Hynes.  [Doc. 24, Ex. A, at ¶ 3].  Anthony Barela ("Barela")'s affidavit is

worded identically.  [Doc. 24, Ex. B, at ¶ 3].

       These affidavits do not mention any racial slurs or racial tension in the Housing Unit, nor do

they track the allegations of the complaint.  Hynes provides nothing else to raise an issue of fact on

the question of whether corrections officers or other prison officials were aware that racial tensions

existed in the unit, or that Hynes in particular was the object of racially-charged hostility from other

inmates.  There is nothing on the record to indicate that there were only two African-Americans in

the unit nor, as Defendants point out, is there anything to show that the other African American

inmate was attacked along with Hynes, a factor which would have strengthened the claim that race

was a factor in the attack.  There is simply no evidence at all that prison officials should have been

aware that Hynes was in danger of attack by Hispanic American or Mexican national residents of the

housing unit based on race as Hynes alleges or, indeed, on any other factor.

       It is insufficient that a party could ultimately submit evidence at trial to support the

allegations.  Rather, to avoid judgment, the party must submit admissible evidence at the summary

judgment stage.

Furthermore, the affidavits from Gamble and Barela, alleging that prior to the attack Hynes requested protection from the inmates who attacked him, do not suffice to raise an issue of fact as to Defendants' knowledge of a significant risk of harm.  Hynes himself did not submit an affidavit, and the statements by his fellow inmates are hearsay.  In addition, they are vague as to the date(s) and circumstances of Hynes's alleged requests for protection, nor whether he made one request or many.  The affidavits fail to state whether these requests were made orally or in writing, and to whom such requests were made.

Although Hynes asserts in his complaint and in his brief that he "repeatedly" and "continuously" informed Defendants of the dangerous situation due to racial slurs and harassment, he does not even include his own affidavit, detailing any dates and circumstances surrounding these alleged warnings to Defendants.

Hynes has simply failed to present any evidence to support his claim that he made Defendants aware that he faced a substantial risk of serious harm at the hands of other inmates.  Even if the Court were to accept the two affidavits as establishing that Hynes, on perhaps only one occasion, asked for protection from other inmates, there is no evidence on the record that Defendants were anything more than negligent in the way they handled any such request.  A single notification from an inmate that another inmate threatened him, without more, does not establish deliberate indifference or a constitutional violation, even if it might indicate negligence:

> Respondents' lack of due care in this case led to serious injury, but that lack of care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent . . . .  Far from abusing governmental power, or employing it as an instrument of oppression, respondent Cannon mistakenly believed that the situation was not particularly serious, and respondent James simply forgot about the note.  The guarantee of due process has

11

> never been understood to mean that the State must guarantee due care
> on the part of its officials.

Davidson v. Cannon, 474 U.S. 344, 347-48, 106 S. Ct. 668, 670 (1986).

There is no evidence or other documentation to support Hynes's assertion that he asked "repeatedly" or "continuously" for protection, nor is there any documentation at all to support Hynes's claim that prior instances of racially motivated violence occurred in Housing Unit D-1. The affiants do not mention any such incidents in their affidavits, and there is nothing else on the record to indicate a pre-existing racial problem in the unit.

Defendant attaches to his Response brief a document entitled "Report of Plaintiff's Expert Michael A. Sisneros." [Doc. 24, Ex. E]. Mr. Sisneros was not present at the time of the assault and has no personal knowledge of the incident nor of the awareness, or lack thereof, of officials at DACDC with respect to dangerous conditions at the facility. Rather, Mr. Sisneros says he read the complaint, various incident reports, and an interview conducted with Hynes on March 21, 2006, which date is over two years after the incident occurred. He does not indicate whether he conducted the interview, or whether instead he merely read a transcript of an interview done by someone else and, if the latter, who conducted the interview and under what circumstances. [Id., at ¶¶ I, IV]. Although one incident report is attached to the Response brief [Ex. C], Mr. Sisneros does not attach to his Expert Report any of the incident reports he says he read, nor does he include any portion of a transcript of the Hynes interview which he also says he read.

In Paragraph V of his Report, Mr. Sisneros gives provides a narrative entitled "Summary of Facts and Opinions."   None of the purported facts in the Summary is supported by references to any evidence on the record.  Much of the Summary appears to be statements made by Hynes,  but there

is no indication whether Hynes told Mr. Sisneros these things, or whether Mr. Sisneros read them

from the transcript of an interview taken by someone else, or whether he obtained this information

from some other source.  There is no affidavit from Hynes attached to the Report.  None of material

which is presented as factual statement is documented in any way.  This Expert Report, therefore,

raises no issues of fact and is incompetent to rebut Defendants' showing that no factual issues exist.

In sum, the Court finds no genuine issue of material fact sufficient to require a trial on the

issue of whether any of the Defendants was aware of a substantial risk of serious harm to Hynes from

other inmates.

In addition, Hynes fails to show that the individual officers at the scene exhibited deliberate

indifference to his plight after the fight began in the television room.  Hynes claims that the first

officer who noticed the fight, Defendant Brenda Dons ("Dons"), did not immediately come to his aid.

Instead, he says, Dons "signaled" to other officers that there was a melee in the housing unit and that

she requested assistance but no one responded immediately to her request.  [FAC, at ¶ 23].  Hynes

alleges further that Dons and Defendant Roy Patterson ("Patterson") stood by and watched as Hynes

was being beaten by the other inmates, and that they did not immediately come to his aid because they

were waiting for other officers to join them.  [FAC, at ¶ 24].

In his Response brief, Hynes further alleges that Defendant Mike Thornton ("Thornton") was

the first officer to respond to Dons's call for assistance and that he and Dons waited for other

corrections officers to arrive before taking any steps to stop the fight.  [Doc. 24, at 2].  Inmates

Gamble and Barela state in their affidavits that they witnessed the altercation and observed that

"Guards stood by and watched as he [Hynes] was beaten by the inmates" on December 19, 2003.

[Doc. 24, Ex. A, at ¶ 4; Ex. B, at ¶ 4].

In addition, Hynes supplies an Incident Report [Doc. 24, Ex. C] written by Dons, in which she states that when she turned and saw the fight in progress, she "called an affray," meaning she flashed the lights to signal a disturbance, and "no one responed [sic]." She stated further that Thornton was the first officer to arrive on the scene, then others, and eventually the dayroom was cleared. The inmate who attacked Hynes was taken to booking, and Hynes was escorted to Medical.

Defendants argue that this evidence does not raise a genuine issue of fact as to "deliberate indifference" rising to the level of a constitutional violation on the part of the individual corrections officers at the scene of the altercation, nor any failure on the part of supervisory or municipal defendants with respect to failure to train or supervise.

In support of their Motion for Summary Judgment, Defendants attach the affidavits of Defendants Dons [Doc. 23, Ex. C], as well as the affidavits of Thornton, Patterson, and Joseph Garcia ("Garcia"), all of whom responded to Dons's affray call [Doc. 23, Exs. D, E, F]. Dons includes as an attachment to her affidavit the DACDC's "Policy and Procedures" statement with respect to "Security and Control (Riot/Disturbance Plan)." This statement sets forth the policy to be followed in the event of a minor disturbance. It reads:

> 1.  Any Officer discovering a minor disturbance shall call Master Control for back up from the Rovers. The Officer shall:
>
>> A.  Keep close observation of the affected area, documenting involved detainees and actions taken.
>>
>> B.  Lock down any detainee's [sic] not involved and all open cells.
>>
>> C.  Turn off telephones, TV and lights in the affected Pod.
>
> 2.  The Shift Sergeant shall respond to help assess the situation. If

further assessment is necessary, the Shift commander shall be called.

[Doc. 23, Ex. 1 to Ex. C].

In his affidavit, Thornton states that he was working as a sergeant at DACDC on the day of the altercation in which Hynes was injured. He heard the affray call, responded to it, and when he arrived saw a number of inmates involved in an altercation in Dayroom D-1. He states further that, "[p]er Doña Ana Detention Center procedure, I waited until I had a number of other officers arrive to assist me before intervening." When the other officers arrived, he says, he separated the inmates involved and then interviewed them to determine what happened. [Doc. 23, Ex. D].

Garcia states in his affidavit that he, too, responded to the affray call in Dayroom D-1 on the day in question and when he got there, he saw Sergeant Thornton waiting for backup to arrive in order to secure the inmates in the dayroom. Once the other officers arrived, he joined them in securing the inmates. [Doc. 23, Ex. E]. Patterson states in his affidavit that after he responded to the affray call and arrived at the dayroom, "the inmates were in the process of locking down" and he assisted Garcia with inmate Hynes. He states further that he was told by another inmate that the altercation apparently started over the television. [Doc. 23, Ex. F].

Defendants contend that the officers on duty that day followed the procedure set forth in the DACDC Riot/Disturbance Plan, which called for the officer first discovering a disturbance to call Master Control for backup assistance, meanwhile keeping close observation of the "affected area," documenting involved detainees, and locking down any non-involved detainees. The Policy does not contemplate that the first observing officer should step in, alone, to attempt to quell a disturbance or fight in progress; it would in fact be a breach of policy and procedure if an officer did so.

The Gamble and Barela affidavits, which state that "Guards stood by and watched" while

15

Hynes was beaten, do not establish deliberate indifference; rather, their statements describe actions on the part of the officers which are consistent with facility policy. There is nothing on the record to show that Dons did not flash the lights to signal an affray immediately upon witnessing the altercation in the dayroom. She so states in both her sworn affidavit and in the incident report, and Defendants state in their "Undisputed Fact" No. 4 that Dons "called for immediate backup" upon witnessing the assault. [Doc. 23, at 3]. As noted above, Plaintiff failed to comply with the Local Rule which requires him to controvert each of Defendants' listed facts with which he does not agree, with particularity and with reference to the record. Hynes's failure to do so means that the Court deems the fact admitted.

The only piece of evidence presented by Hynes which in any way supports his assertion that DACDC employees did something wrong in the course of the melee is Dons's statement in her Incident Report that she "flashed the lights and no one responed [sic]." It is not clear from this statement whether she meant that no one responded by telephone or intercom to tell her they were coming, or whether she meant that no other officers arrived on the scene immediately.

In any event, this piece of evidence is insufficient to support the claim that these officers were deliberately indifferent to Hynes's predicament. Even if they were negligent in not responding, that would not be sufficient to establish a constitutional violation. Davidson v. Cannon, supra, 474 U.S. at 347. Defendants carried their burden of showing no genuine issue of material fact as to deliberate indifference, and the burden shifts to Hynes to provide evidence sufficient to raise a factual issue on the subjective element of the claim of failure to protect – that is, he must come forth with some evidence to show that Defendants "act[ed] with deliberate or callous indifference" to his needs. Id.. Even if corrections officers were slow to respond to the affray signal, this falls short of establishing

the requisite reckless or callous state of mind necessary to support this claim.  Summary judgment is appropriate in a deliberate indifference case if the "plaintiff's allegations . . . implicate only defendants' negligence and do not establish the more culpable state of mind necessary to support claims of the denial of a constitutional right."  White v. Colorado, 82 F.3d 364, 367 (10th Cir. 1996).

In sum, neither the individual defendants, nor the supervisory or municipal defendants, can be held liable under Hynes's claim of failure to protect, and summary judgment will issue in favor of all Defendants on this claim.

C.  Failure to Provide Adequate Medical Care

Hynes also alleges a constitutional violation with respect to Defendants' treatment of him after the altercation, in that they failed to provide adequate and appropriate medical care for his injuries.  In Estelle v. Gamble, 429 U.S. 97, 104-05, 97 S. Ct. 285, 291 (1976), the Supreme Court held that, under certain conditions, delay or denial of treatment by prison medical personnel can constitute cruel and unusual punishment in violation of the Eighth Amendment.  Allegations of deliberate indifference to the serous medical needs of pretrial detainees, while governed by the Due Process clause rather than the Eighth Amendment, are subject to the same analysis as cases involving convicted inmates.  Lopez v. LeMaster, supra, at 759 n.2.

As was true with the claim of failure to protect, the assertion of deliberate indifference with respect to medical care has two components, one objective and one subjective.  Estelle v. Gamble, supra.  To escape summary judgment, the plaintiff must make a two-part showing that genuine issues of fact exist as to whether: (1) the medical need was sufficiently serious, and whether (2) the defendants acted with a culpable state of mind in that they knew of the serious medical need and wre deliberately indifferent to it.  Handy v. Price, 996 F.2d 1064, 1067 (10th Cir. 1993).

A "serious" medical need is generally seen as one involving a life-threatening situation, or an instance in which it is apparent that delay would exacerbate the prisoner's medical problem or could result in a lifelong handicap or a permanent loss.  A delay in medical treatment does not violate a prisoner's constitutional rights unless the plaintiff can show that the delay resulted in substantial harm. Olson v. Stotts, 9 F.3d 1475, 1477 (10th Cir. 1993).  With regard to the subjective component, allegations of inadvertent failure to provide adequate medical care or of a negligent diagnosis are not sufficient to establish the requisite culpable state of mind.  Handy v. Price, *supra*, at 1067.  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle v. Gamble, *supra*, 429 U.S. at 106.

In the present case, it is apparent that Hynes had a serious medical need as a result of the beating on December 19, 2006.  He sustained a closed depressed frontal bone fracture which required surgery.  [Doc. 23, Ex. G, attachment 1, at unnumbered p. 1].  When examined at the hospital that day, he was assessed with having sustained a blow to the head, with obvious deformity resulting in neurological deficits.  [Id., at unnumbered p. 2].

However, Hynes fails to support his assertion on the second prong of the test for deliberate indifference, the subjective element of a "culpable" state of mind on the part of Defendants.   Again, Hynes relies primarily on allegations of the complaint and arguments of counsel in attempting to establish this element.   The only evidence he presents is vague, conclusory, or incompetent, and the Court finds he has not sustained his burden on summary judgment.

Hynes alleges in his complaint that, after the assault on December 19, 2003 he was bleeding and suffering from internal injuries and complained of dizziness and head trauma.  "After some extended period of time," he says, he was transported to the Medical Services Unit of DACDC,

where he remained for approximately 30 minutes before he started vomiting blood.  At that point, he alleges, he was transported to a hospital emergency room where he was diagnosed with a sinus fracture and a skull depression fracture.  [FAC, at ¶ 30].

Hynes further alleges that following his discharge from the emergency room, he was sent back to the Medical Services Unit at DACDC where, in spite of his continued complaints of nausea, dizziness, intermittent vomiting and excruciating pain, and in spite of his repeated requests to be returned to the hospital, he was kept at the Medical Services Unit for three days.  He alleges that his requests for a change of clothes and a shower were ignored, as were his "persistent requests for medical care in the period of December 19 through December 22, 2003."  [FAC, at ¶ 31].  He says that after repeatedly complaining of cranial swelling, he was returned to the hospital on December 22, where he "underwent emergency surgery." [FAC, at ¶ 33].  Counsel also makes the allegation in his briefing that Hynes was taken to court on Monday morning, December 22, 2003 and that United States District Judge William Johnson[2] "ordered Mr. Hynes to be taken to the hospital." [Doc. 24, at 2].

The Clerk's Minutes of the December 22, 2003 appearance before Judge Johnson, which Hynes attaches as an exhibit to the Response brief, do not indicate that Judge Johnson "ordered" that Hynes be taken to the hospital.  The Comments section of the Minutes reads:  "Defense orally moves to continue hearing; deft was attacked @ detention center & requires medical attention.  Matter to be reset by Clerk's office." [Doc. 25, Ex. C].  According to the Minutes, the hearing began at 10:44 a.m. and ended one minute later, at 10:45 a.m.  [Id.].  The record establishes only that Hynes

---

[2]Judge Johnson is incorrectly identified as a "United States Magistrate Judge" in the Response brief.

appeared in court as scheduled, that his attorney moved to continue the hearing so that Hynes could

be seen by a doctor, and that Judge Johnson granted this request.

The record of Hynes's criminal case, which this Court judicially notices,[3] indicates that, at the

time the altercation occurred, the date for Hynes's sentencing hearing had already been scheduled for

Monday, December 22, 2003.  [Doc. 46 in CR 02-613].  Medical records from the hospital visit on

Friday, December 19, 2003, establish that Hynes was seen by a physician at the hospital that

afternoon or evening after the fight.  The doctor on duty diagnosed Hynes with a closed depressed

frontal bone fracture and prescribed medications including antibiotics, analgesics (pain killers), and

antiemetics (nausea medication).  The doctor discharged Hynes back to DACDC, writing in the

medical record that Hynes was to be brought back to the hospital's triage area on Monday at 11:30

a.m. when he would be seen by Dr. Clint Welsh, surgeon, for preop evaluation.  The examining

doctor noted further that Hynes should "anticipate frontal bone surgery Tuesday."  [Doc. 23, Ex. G,

attachment 1].

In his allegations and argument, Hynes paints a picture of neglect and inattention from prison

officials at the time of the injuries and over the weekend afterward, and implies that Defendants

allowed him to be brought to court on Monday in such a state that the judge "ordered" him to be

taken to the hospital.  These allegations are not borne out by the record.

Daniel J. Zemek ("Zemek") is a Certified Nurse Practitioner and serves as the Medical

Director of DACDC.  He supplied his affidavit in connection with this summary judgment motion.

---

[3]A Court may *sua sponte* take judicial notice of its own records and may take notice of
proceedings in other courts, if those proceedings have a direct relation to the matters at issue.  St.
Louis Baptist Temple, Inc. v. FDIC, 605 F.2d 1169, 1172 (10th Cir. 1979).  Judicial notice is
particularly applicable to the court's own records of prior litigation closely related to case before it.
United States v. Estep, 760 F.2d 1060, 1063 (10th Cir. 1985).

[Doc. 23, Ex. G].  Zemek states in the affidavit that he was on duty on December 19, 2003, when Hynes was brought into the medical unit.  He says that this occurred approximately 30 minutes after the disturbance.

Hynes alleges in his complaint that he was not transported to the medical unit for "some extended period of time" [FAC, at ¶ 30], and counsel asserts in the briefing that after Hynes was taken the medical unit, he remained there "for about half an hour before he began vomiting blood." [Doc. 24, at 2].  However, there is no evidence on the record to support these assertions of delay in providing medical care to Hynes after the incident.

Inmates Gamble and Barela both state in their affidavits that after the beating, "prompt medical care was not provided to him by the Doña Ana staff, although several of us had made requests, as well as Mr. Hynes, to be seen by a doctor."  [Doc. 24, Exs. A, B].  Hynes's allegations of an "extended period of time," and the inmate-witnesses' assertions that "prompt" medical care was not provided are too vague and conclusory to create an issue of fact.  Hynes does not state how long this "extended period" was.  The other witnesses do not define what they mean by "prompt" medical care.

If in fact Hynes was not taken to the medical unit for 30 minutes, that fact would not establish deliberate indifference in the context of the aftermath of a melee in which several inmates were injured and officials were charged with determining what happened and which inmates needed medical care. Hynes does not specifically dispute Zemek's assertion that Hynes was brought to the medical unit approximately 30 minutes after the fight ended.

Nor is there any record evidence of a delay in transporting Hynes to the hospital that Friday. Hynes himself alleges that he remained in the medical unit for 30 minutes before he "started vomiting

blood," at which point he was transported to the hospital emergency room.  [FAC, at ¶ 30].  This allegation is not supported by any evidence on the record and, even if it were, there is no indication that a 30-minute delay under the circumstances was an inordinate amount of time or indicated deliberate indifference to his injuries.  Zemek's affidavit establishes that he appreciated the seriousness of Hynes's injuries, determined that he needed to be seen by a physician, and arranged a medical transfer to Memorial Medical Center.  [Doc. 23, Ex. G].

    With regard to the allegation surrounding the Monday court appearance, the Court notes that it was the determination of the treating physician at Memorial Medical Center, not the decision of Defendants, to discharge Hynes to DACDC for the weekend.  The examining physician apparently decided that it was not necessary to admit Hynes to the hospital on Friday, but that instead he could safely be discharged to DACDC to spend the weekend there before being returned on Monday for a surgical consultation.  The medical records establish that Hynes was scheduled to return to the hospital at 11:30 a.m. on Monday.  No doctor indicated that Hynes's health would be jeopardized if he attended the court date at 10:44 a.m. that Monday morning, and it appears that he was taken to court on the way to the hospital.  His attorneys spent only one minute before the judge in order to ask for a continuance, which was granted.

    It is incorrect to imply that Hynes was brought into court in an injured state and was only sent to see a doctor because the judge ordered it.  If the physician who examined Hynes on Friday afternoon or evening determined that he was stable enough to be discharged and transported to the detention center for the weekend and then transported back to the hospital on Monday, Defendants cannot be faulted for following the doctor's recommendation.  There is no indication on the record, nor even an allegation, that any doctor suggested that Hynes was too fragile to appear in court on

Monday morning for a minute or two on the way to the hospital.   Hynes also alleges in his complaint that Defendants ignored his repeated requests over the weekend of December 19-21 to be taken back to the hospital, and that his requests for a change of clothes and a shower were also ignored during this period.  [FAC, at ¶ 31].  However, Hynes does not support these allegations with any evidence at all, not even his own affidavit.

The record shows further that Hynes was taken back to the hospital on Monday, as the doctor ordered, and that the necessary surgery was performed on Tuesday, December 23, 2003.  Hynes remained in the hospital until his discharge on December 25, 2003, and he thereafter remained in the medical unit of DACDC until he was cleared to be returned to the general population on January 2, 2004.  [Doc. 23, Ex. G].  Hynes alleges that during the period he was kept in the medical unit following his surgery, he was not given clean linens or clothes and did not receive adequate medical care.  [FAC, ¶ 34;  Doc. 24, at 3].  These allegations and arguments of counsel are, again, unsupported by any factual evidence.

Zemek's affidavit and Hynes's medical records also indicate that he was treated appropriately in January and February 2004, after he complained of continuing headaches.  [Doc. 23, Ex. G, and attachment 1 thereto].  Hynes was apparently well enough by January 19, 2004 to participate in recreation activities, as he requested medical treatment for headaches occurring after he was hit in the head while playing basketball.  Zemek ordered referrals to a neurologist and a neuro-ophthalmologist, and arrangements were made to have Hynes transported to these appointments in Albuquerque.  [Doc. 23, Ex. G].  Zemek also ordered an MRI of Hynes's head on March 22, 2004.  Hynes was transferred out of DACDC on March 25, 2004.  Id..  Hynes does not dispute this evidence.

A review of the record indicates that there simply is no evidence to raise a factual issue as to any "deliberate indifference" on the part of Defendants with respect to Hynes's serious medical needs. On the contrary, the record indicates that Defendants were well aware of the serious nature of Hynes's injury and that they did took appropriate and prompt action to ensure that he received medical care for the injury, both immediately after the altercation and in later weeks and months when it appeared that Hynes required further treatment.

There is no genuine issue of material fact to take to a jury on the issue of deliberate indifference to Hynes's medical needs at DACDC. Neither the individual defendants, nor the supervisory or municipal defendants, can be held liable under this claim and summary judgment is appropriate.

<u>State Law Claims</u>

By this Order, the Court dismisses Count One of the complaint, which is the basis on which this case was removed to federal court. Although Defendants also seek dismissal of one of the Counts under the New Mexico Tort Claims Act, the Court will decline to exercise jurisdiction over the purely state law claims remaining in the case and will remand the action to state court. 28 U.S.C. § 1367(c)(3). "'Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.'" <u>McWilliams v. Jefferson County</u>, __ F.3d __, 2006 WL 2556350, at *3 (10th Cir. Sep. 6, 2006).

**<u>Order of Dismissal and Remand</u>**

IT IS THEREFORE ORDERED that Defendants' Motion for Partial Summary Judgment as to Individual Defendants and to Counts I and III [Doc. 22] is granted in part to the extent that Count One is dismissed;

IT IS FURTHER ORDERED that, as the Court declines to exercise jurisdiction over Plaintiff's state law claims set forth in Counts Two and Three, those claims are hereby remanded to state court.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge

25